UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

TAMMI LYNN LEONI,

                    Plaintiff,

v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

                    Defendants.

Case No. 1:15-cv-00554-CWD

**MEMORANDUM DECISION AND
ORDER**

## INTRODUCTION

Currently pending before the Court is Tammi Leoni's Petition for Review of the

Respondent's denial of social security benefits, filed on November 24, 2015. (Dkt. 1.)

The Court has reviewed the Petition for Review and the Answer, the parties'

memoranda, and the administrative record (AR), and for the reasons that follow, will

remand the decision of the Commissioner.

## PROCEDURAL HISTORY

Petitioner filed an application for Disability Insurance Benefits and Supplemental Security Income on September 25, 2012. This application was denied initially and on reconsideration, and a hearing was held on January 29, 2014, before Administrative Law Judge (ALJ) John Molleur. After hearing testimony from Petitioner, Petitioner's spouse, and a vocational expert, ALJ Molleur issued a decision on March 3, 2014, finding Petitioner not disabled. Petitioner timely requested review by the Appeals Council, which denied her request for review on October 9, 2015.

Petitioner appealed this final decision to the Court. The Court has jurisdiction to review the ALJ's decision pursuant to 42 U.S.C. § 405(g).

At the time of the hearing, Petitioner was forty-eight years of age. Petitioner has a high school education, and completed one semester of college as well as a dental assistant vocational program. Her prior work experience includes work as a billing collections clerk and benefit clerk.

## SEQUENTIAL PROCESS

The Commissioner follows a five-step sequential evaluation for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920. At step one, it must be determined whether the claimant is engaged in substantial gainful activity. The ALJ found Petitioner had not engaged in substantial gainful activity since her alleged onset date of August 15, 2007. At step two, it must be determined whether the claimant suffers from a severe impairment. The ALJ found Petitioner's fibromyalgia, migraines, post

MEMORANDUM DECISION AND ORDER

arthroscopic repair of a superior labral tear and subacromial decompression of the left shoulder, post plantar fasciotomy of the left heel, osteopenia, obesity, asthma, Barrett's esophagus, and GERD severe within the meaning of the Regulations.

Step three asks whether a claimant's impairments meet or equal a listed impairment. The ALJ found Petitioner's impairments did not meet or equal the criteria for the listed impairments, specifically considering Petitioner's fibromyalgia under Sections 1.00 and 11.00, which address musculoskeletal impairments and neurological disorders, respectively. The ALJ considered also whether Petitioner's asthma met Listing 3.03 (Asthma), and whether Petitioner's GERD and Barrett's esophagus met Listing 5.00 (Digestive System Diseases). The ALJ considered also whether Petitioner's headaches were functionally equivalent to Listing 11.03 (Nonconvulsive epilepsy). And finally, the ALJ considered whether Petitioner's shoulder and foot injuries met Listings 1.02 or 1.04 (Major Dysfunction of a joint or Disorder of the Spine). The ALJ determined none of Petitioner's impairments met or equaled the criteria for the listed impairments considered.

If a claimant's impairments do not meet or equal a listing, the Commissioner must assess the claimant's residual functional capacity (RFC) and determine, at step four, whether the claimant has demonstrated an inability to perform past relevant work. In assessing Petitioner's functional capacity, the ALJ determines whether Petitioner's complaints about the intensity, persistence and limiting effects of her pain are credible. Here, the ALJ found Petitioner's complaints not entirely credible. The ALJ found also

that the medical source statement of Petitioner's treating physician, Dr. Hammond, was not consistent with the medical records from Petitioner's onset date forward. Accordingly, the ALJ gave Dr. Hammond's opinion minimal weight. After so doing, the ALJ determined Petitioner retained the RFC to perform sedentary work, with limitations on climbing, postural activities, avoiding temperature extremes and dusts, fumes, gases, or other odors, as well as no direct exposure to vibrations. With regard to Petitioner's mental limitations due to fibromyalgia, the ALJ limited Petitioner to simple, three and four step tasks. (AR 16.)

The ALJ found Petitioner not able to perform her past relevant work as either a billing collections clerk or benefits clerk. If a claimant demonstrates an inability to perform past relevant work, the burden shifts to the Commissioner to demonstrate, at step five, that the claimant retains the capacity to make an adjustment to other work that exists in significant levels in the national economy, after considering the claimant's residual functional capacity, age, education and work experience. Here, the ALJ found Petitioner retained the ability to perform the requirements of representative occupations such as document preparer, call out operator, or semiconductor bonder. Consequently, the ALJ determined Petitioner was not disabled.

## STANDARD OF REVIEW

Petitioner bears the burden of showing that disability benefits are proper because of the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to

last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A); *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971). An individual will be determined to be disabled only if her physical or mental impairments are of such severity that she not only cannot do her previous work but is unable, considering her age, education, and work experience, to engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

On review, the Court is instructed to uphold the decision of the Commissioner if the decision is supported by substantial evidence and is not the product of legal error. 42 U.S.C. § 405(g); *Universal Camera Corp. v. Nat'l Labor Relations Bd.*, 340 U.S. 474 (1951); *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (as amended); *DeLorme v. Sullivan*, 924 F.2d 841, 846 (9th Cir. 1991). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla but less than a preponderance, *Jamerson v Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997), and "does not mean a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

The Court cannot disturb the Commissioner's findings if they are supported by substantial evidence, even though other evidence may exist that supports the petitioner's claims. 42 U.S.C. § 405(g); *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). Thus, findings of the Commissioner as to any fact, if supported by

**MEMORANDUM DECISION AND ORDER**

substantial evidence, will be conclusive. *Flaten*, 44 F.3d at 1457. It is well-settled that, if there is substantial evidence to support the decision of the Commissioner, the decision must be upheld even when the evidence can reasonably support either affirming or reversing the Commissioner's decision, because the Court "may not substitute [its] judgment for that of the Commissioner." *Verduzco v. Apfel*, 188 F.3d 1087, 1089 (9th Cir. 1999).

When reviewing a case under the substantial evidence standard, the Court may question an ALJ's credibility assessment of a witness's testimony; however, an ALJ's credibility assessment is entitled to great weight, and the ALJ may disregard a claimant's self-serving statements. *Rashad v. Sullivan*, 903 F.2d 1229, 1231 (9th Cir. 1990). Where the ALJ makes a careful consideration of subjective complaints but provides adequate reasons for rejecting them, the ALJ's well-settled role as the judge of credibility will be upheld as based on substantial evidence. *Matthews v. Shalala*, 10 F.3d 678, 679-80 (9th Cir. 1993).

## DISCUSSION

Petitioner contends the ALJ erred at steps three and four. At step three, Petitioner asserts the ALJ did not properly evaluate Petitioner's fibromyalgia in accordance with SSR 12-2P, and therefore did not properly evaluate her fibromyalgia with regard to a listing. At step four, Petitioner asserts the ALJ did not properly assess the opinion of her treating physician, Dr. Hammond; improperly rejected Petitioner's and her husband's testimony; and did not consider the combined

MEMORANDUM DECISION AND ORDER

effects of Petitioner's exertional and non-exertional limitations when formulating her residual functional capacity.

## 1. SSR 12-2P and Listing Level

Petitioner argues the ALJ neglected to address SSR 12-2p because the ALJ found fibromyalgia is not a listed impairment. (AR 14.) The ALJ indicates he considered SSR 12-2p, and he evaluated whether Petitioner's fibromyalgia medically equaled a listing. (AR 14.)

Here, Petitioner seems to conflate SSR 12-2p with what constitutes listing level requirements. The Court finds the ALJ properly considered SSR 12-2p, which establishes two sets of guidelines for analyzing whether a claimant has fibromyalgia. The guidelines are relevant to the ALJ's determination at step two regarding whether a claimant has a medically determinable impairment of fibromyalgia. *Wells v. Colvin*, 2016 WL 1070665 *6 (N.D. Cal. Mar. 18, 2016). The ALJ found Petitioner's fibromyalgia was a medically determinable impairment which was severe under step two.

At step three, the ALJ found Petitioner's impairments did not medically equal or meet a listed impairment. The ALJ noted the absence of any listing directly addressing fibromyalgia, and reviewed Petitioner's symptoms under Listing 1.00 and Listing 11.00 pertaining to musculoskeletal and neurological impairments, respectively.[1] The ALJ found Petitioner's impairments did not meet or equal a listing. There is therefore no error in the ALJ's failure to incorporate SSR 12-2p's diagnostic guidelines in his step three analysis,

---

[1] SSR 12-2p notes fibromyalgia is not a listed impairment. SSR 12-2p, 2012 WL 3104869, at *6.

**MEMORANDUM DECISION AND ORDER**

because step three required him only to determine whether Petitioner's impairments equaled a listed impairment. The ALJ found they did not. *See Id.* (finding no error when the ALJ failed to mention SSR 12-2p because it had no bearing on the ALJ's step three determination once the ALJ determined the claimant suffered from fibromyalgia).

In her reply brief, Petitioner attempts to salvage her argument, contending the ALJ made merely a conclusory remark with regard to the listings he considered in connection with Petitioner's fibromyalgia, and that he failed to explain in detail why Petitioner's symptoms did not equal a listing. For a claimant to qualify for benefits by showing that her unlisted impairment, or combination of impairments, is "equivalent" to a listed impairment, she must present medical findings equal in severity to all the criteria for the one most similar listed impairment. *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (citing 20 CFR § 416.926(a) (1989)) (a claimant's impairment is "equivalent" to a listed impairment "if the medical findings are at least equal in severity" to the medical criteria for "the listed impairment most like [the claimant's] impairment."). When a person has a combination of impairments, "the medical findings of the combined impairments will be compared to the findings of the listed impairment most similar to the individual's most severe impairment." *Id.* (citing SSR 83-19 at 91).

While the Court agrees the ALJ's statements are conclusory, Petitioner has not offered any theory, plausible or otherwise, as to how her fibromyalgia and other impairments combined to equal a listed impairment. Nor has Petitioner pointed to evidence that shows how her combined impairments equal a listed impairment. *See Lewis*

**MEMORANDUM DECISION AND ORDER**

*v. Apfel*, 236 F.3d 503, 514(9th 2001) (finding that, although the ALJ did not discuss the combined effects of the claimant's impairments or compare them to any listing, the petitioner's failure to offer any theory or point to evidence explaining how his combined impairments equal a listed impairment was fatal to his claim). Petitioner has not put forth any evidence Petitioner suffered an extreme loss of function in her upper extremities preventing her from performing fine and gross movements effectively, or an extreme loss of function in the lower extremities causing an inability to ambulate effectively, which findings are required under Listing 1.00. Similarly, Petitioner has not pointed to evidence showing how her impairments equal Listing 11.00, which requires a finding of persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station.

The ALJ did not err in concluding Petitioner's conditions did not equal a listed impairment.

**2.     Physician Opinions**

Petitioner contends the ALJ erroneously rejected the opinion of Petitioner's treating neurologist, Dr. Hammond, because the ALJ did not properly weigh the opinion against those of the state agency physicians, and erroneously concluded Dr. Hammond's opinions were not supported by or consistent with other medical evidence.

The Ninth Circuit Court of Appeals distinguishes among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who

neither examine nor treat the claimant (nonexamining physicians). *Lester v. Chatter*, 81 F.3d 821, 830 (9th Cir. 1995). As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant. *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987).

Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons. *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991). Also, "clear and convincing" reasons are required to reject the treating doctor's ultimate conclusions. *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988). Even if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record for so doing. *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983).

An ALJ is not required to accept an opinion of a treating physician if it is conclusory and not supported by clinical findings. *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992). Additionally, an ALJ is not bound to a physician's opinion of a claimant's physical condition or the ultimate issue of disability. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). If the record as a whole does not support the physician's opinion, the ALJ may reject that opinion. *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004). Items in the record that may not support the physician's opinion include clinical findings from examinations, conflicting medical opinions, conflicting physician's treatment notes, and the claimant's

daily activities. *Id.*; *Bayliss v. Barnhart*, 427 F.3d 1211 (9th Cir. 2005); *Connett v. Barnhart*, 340 F.3d 871 (9th Cir. 2003); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595 (9th Cir. 1999). An ALJ also may reject a treating physician's opinion if it is based "to a large extent" on a claimant's self -reports that have been property discounted as not credible. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).

In January of 2013, Petitioner's counsel interviewed Dr. Hammond. Dr. Hammond confirmed he was Petitioner's treating neurologist since 2006, and that he examined her every three to four months. (AR 1279.) Dr. Hammond stated he diagnosed Petitioner with fibromyalgia in May of 2008, based upon pain in several tender points, her forgetfulness (or "fibro fog"), as well as related symptoms of depression and anxiety. (AR 1280.) Dr. Hammond also treated Petitioner for migraines. (AR 1281.) When asked whether Petitioner could sustain a five day a week, eight hour per day schedule, Dr. Hammond stated Petitioner could not sustain a job with those requirements. (AR 1281, 27.) During the hearing, the ALJ asked the vocational expert whether an individual who would be absent from work on the average of two to three days each month due to chronic pain, fatigue, or other complications, would be able to sustain full-time employment in the jobs listed. (AR 56-57.) The vocational expert was of the opinion such an individual would not be able to sustain full-time employment.

In contrast, Drs. Vestal and Coolidge, both state agency medical consultants, (reviewing physicians), reached opinions Petitioner could sustain employment. Dr. Vestal, in November of 2012 was of the opinion Petitioner could stand or walk about 6

hours in an 8-hour work day, and sit 6 hours in an 8-hour workday, and that her fibromyalgia affecting her neck, back, and hips would limit her ability to lift more than 20 pounds occasionally, and 10 pounds frequently. (AR 26, 68.) Dr. Coolidge, in February of 2013, opined Petitioner could stand or walk 2 hours in an 8-hour work day and sit about 6 hours in an 8-hour work day. (AR 84, 27.) In support of the ALJ's conclusion, the ALJ found the opinions of Drs. Vestal and Coolidge "are generally supported by the clinical observations, diagnostic imaging, and course of treatment," and therefore accorded these opinions substantial weight. (AR 27.) The ALJ rejected Dr. Hammond's opinion because his opinion was conclusory, and because Petitioner's subjective statements were not consistent with Dr. Hammond's observations during treatment, "as discussed above." (AR 27.)

The Court finds the explanation given in *Anderson v. Apfel*, 100 F.Supp.2d 1278 (D. Kan. 2000), helpful for understanding fibromyalgia, against which this Court assessed the physicians' opinions.

> "Fibromyalgia is defined as a syndrome of pain in the fibrous tissues, muscles, tendons, ligaments, etc." *Duncan v. Apfel*, 156 F.3d 1243, 1998 WL 544353, at *2 (10th Cir. Aug. 26, 1998) (Table) (citing *The Merck Manual of Diagnosis & Therapy*, at 1369 (Robert Berkow & Andrew J. Fletcher eds., 16th ed.1992)). "The symptoms of fibromyalgia are entirely subjective, and there are no laboratory tests to identify its presence or severity." *Ward v. Apfel*, 65 F.Supp.2d 1208, 1213 (D. Kan. 1999) (citing *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996)). "Because fibromyalgia, ..., is diagnosed by ruling out other diseases through medical testing, ..., negative test results or the absence of an objective medical test to diagnose the condition cannot support a conclusion that claimant does not suffer from a potentially disabling condition." *Lantow v. Chater*, 98 F.3d 1349, 1996 WL 576012, at *1 (10th Cir. Oct.8, 1996) (Table). "Courts have recognized that the pain suffered by those diagnosed with

fibromyalgia can be disabling." *Ward v. Apfel*, 65 F.Supp.2d at 1213
(citing *Sarchet v. Chater*, 78 F.3d at 309; *Cline v. Sullivan*, 939 F.2d 560
(8th Cir. 1991); *Biri v. Apfel*, 4 F.Supp.2d 1276 (D. Kan. 1998)).

*Anderson*, 100 F.Supp.2d at 1286.

Here, although the ALJ gave a lengthy recitation of Petitioner's medical history

(AR 17 – 21), the ALJ's lack of analysis as to which "multiple treatment records"

illustrate the inconsistency between Petitioner's subjective statements of pain and Dr.

Hammond's observations leaves the Court hunting and pecking among the records. Based

upon the Court's independent review of Petitioner's medical records, it appears Petitioner

claims her fibromyalgia pain and headaches are the main reason she contends she cannot

sustain full time employment. Accordingly, Petitioner's treatment for her labral tear of her

left shoulder (AR 17), imaging studies of her left femur and Dexa scans (AR 17), plantar

fasciotomy, Achilles tendinitis of the left foot, osteoarthritis of her left ankle joint, cough,

gastroenteritis, and asthma (AR 18-19) bears little relevance to her continued treatment for

fibromyalgia and related headaches.

As an example of the medical records the ALJ selectively chose, the ALJ cited to

Dr. Hammond's note in August of 2007 that Petitioner reported her headaches were

improved, and she was feeling a bit better, and later in November of 2007, that her

headaches had probably increased because of stress and taking birth control pills. (AR

690, 691.) The ALJ did not discuss the medical records indicating Petitioner's continued

complaints of fibromyalgia pain and recurrent headaches, outlined below, and instead

selectively discussed portions of the record that either related to other complaints, or to

**MEMORANDUM DECISION AND ORDER**

negative objective tests such as bone scans, MRI's, and x-rays, which are not useful for diagnosing fibromyalgia pain. (*See, e.g.*, AR 19 (discussing lumbar spine imaging in June 0f 2009; x-rays in July of 2009; a normal physical exam in April of 2011; normal chest x-rays in April 2011; and normal lumbar spine radiographs in June of 2010)).

Petitioner's medical records, in contrast, show continued treatment for fibromyalgia pain, beginning in late 2007. On November 20, 2007, Petitioner saw Dr. Hammond complaining of a headache "increasing over the past month." She reported she had been treating her headaches with ibuprofen, and if that did not relieve her pain, she tried Imitrex and Vicodin. (AR 691.) Petitioner reported also daytime sleepiness. At her next office visit, on March 19, 2008, Petitioner reported she was having one migraine a month, lasting two to three days, for which she took Vicodin. (AR 692.) On May 20, 2008, Petitioner reported "everything hurts," especially her muscles. (AR 715, 1106.) Petitioner reported also that her muscles were primarily what hurt, and that she continued to have headaches and body aches. Dr. Hammond observed she looked "ill and uncomfortable," and noted moderate spasm of her scalenes and cervical paraspinals, and mild spasm of her lumbar paraspinas, all of which were mildly tender to palpitation. (AR 715.) It was at this time that Dr. Hammond diagnosed fibromyalgia as the "best fit" for Petitioner's complaints of pain. Petitioner reported also that she was continuing to have "a lot of headaches," for which she took Vicodin. (AR 715.) Yet, the only mention the ALJ made of this May 20, 2008 progress note was that Petitioner's "headaches went away with Vicodin." (AR 18.)

**MEMORANDUM DECISION AND ORDER**

Petitioner, on July 16, 2008, reported two headaches in the last couple of weeks, body aches, and was noted by Dr. Hammond to have moderate tender points upon palpitation. (AR 694.) On September 10, 2008, Petitioner reported to him that she was feeling better after taking Lyrica, but that her insurance company would not approve the medication. (AR 696.) Petitioner still reported recurring headaches, which were improved with Neurontin. (AR 697.) On October 22, 2008, Petitioner did report increased headaches secondary to stress, (AR 698, 18), but also that she was continuing to experience neck pain and fatigue such that she had to leave church early and sleep for the rest of the day. Petitioner reported also that the Neurontin had not been effective other than decreasing her headaches, and that she still took an occasional Vicodin for headache pain. (AR 698.)

In addition to regular visits with Dr. Hammond, Petitioner received chiropractic treatment from Dr. Olsen throughout 2008, 2009, 2010, and 2011. On January 30, 2008, Petitioner complained of pain and decreased motion in the cervical area, with tightness and discomfort in her lower back area, along with accompanying headaches. (AR 749.) Dr. Olsen noted significant hypertonicity of the paraspinal musculature in the upper thoracic and cervical spine, with associated pain and tenderness, as well as pain and tenderness in the thoracic and mid-scapular area. On April 28, 2008, Petitioner complained of pain and decreased motion in her cervical area, along with discomfort in her mid-back area, along with headaches. (AR 750.) Dr. Olsen noted motion restriction, pain, and tenderness in the paraspinal musculature, thoracic, and mid-scapular areas, and associated motion restrictions.

**MEMORANDUM DECISION AND ORDER**

Petitioner reported similar complaints on May 1, 2008, and again on May 5, 2008; May 12, 2008; May 28, 2008; June 2, 2008; August 4, 2008; August 26, 2008; September 9, 2008; October 30, 2008; January 29, 2009; February 9, 2009; March 4, 2009; April 29, 2009; July 2, 2009; September 1, 2009; October 7, 2009; October 22, 2009; November 24, 2009; January 25, 2010; February 1, 2010; March 16, 2010; July 8, 2010; September 28, 2010; January 6, 2011; January 10, 2011; April 20, 2011; June 23, 2011; June 29, 2011; and September 1, 2011. (AR 751, -779.) The ALJ failed to mention the continued chiropractic treatment beyond 2008 and continuing through 2011, and failed to discuss Petitioner's continued reports of pain to Dr. Olsen, which were consistent with her reports to Dr. Hammond.

On January 23, 2009, Petitioner reported to Dr. Hammond that her fibromyalgia had been "quite painful" and she was feeling "sore all over." (AR 700.) Dr. Hammond noted moderate spasm of her thoracic paraspinals bilaterally, "very tender to palpitation." (AR 700.) On April 24, 2009, Petitioner complained of joint pain, and headaches for which she continued to take Vicodin. (AR 702.) On July 22, 2009, Petitioner reported pain in her right hip, headaches for one week a month, and Dr. Hammond noted tenderness in her hip muscles. (AR 704.)

Between April 15, 2009, and September 23, 2009, Petitioner received physical therapy approximately two to four times a month. (AR 400 – 409.) Throughout this period, Petitioner consistently reported pain in her right hip and hands; low back; and neck. The therapist performed trigger point release and muscle release techniques. (AR

**MEMORANDUM DECISION AND ORDER**

408.) Treatment notes corresponding to May of 2009 indicate Petitioner reported repeated headaches and pain, and even canceled an appointment on May 11, 2009, because she was not feeling well. (AR 407.) Treatment notes corresponding to August and September of 2009, indicate Petitioner reported feeling better, and that she felt the TENS unit was helping a lot. (AR 400.) On September 23, 2009, Petitioner was discharged from physical therapy. (AR 400.)

On September 21, 2009, Petitioner reported continued fibromyalgia pain, and was requesting an increase in her Lyrica dosage; pain caused by bursitis in her left hip; and continued headaches, which were treated with Imitrex. (AR 706.) Dr. Hammond increased Petitioner's Lyrica, noted mild spasm of her cervical, thoracic and lumbar paraspinals with moderate tenderness to palpitation, and that Petitioner was moving slowly. (AR 706.) On December 14, 2009, Petitioner reported an increase in pain in her neck and back, and that she had increased her intake of Vicodin. (AR 708.) Petitioner reported only one and a half good days since last seeing Dr. Hammond. Dr. Hammond observed slow movements, and documented moderately tender points to palpitation, resulting in his subjective conclusion that Petitioner's fibromyalgia pain was worse. (AR 708.) On January 22, 2010, Petitioner reported stopping certain medications (Lexapro, Lyrica, and Savella) because of sweating spells and palpitations, and despite doing so, her pain had not changed. (AR 710.) Petitioner reported continuing to take Neurontin, Vicodin, and Zanaflex, and that she continued to experience pain across her neck and back. (AR 710.) Dr. Hammond noted moderate tender points in her neck, scalenes, thoracic, and lumbar paraspinals. (AR

710.) Dr. Hammond sought a second opinion, and referred Petitioner to the Life Tree Pain Clinic in Salt Lake City, Utah, as there was not "a lot else to offer at this time." (AR 709.)

On April 23, 2010, Petitioner reported pain in her neck, shoulders, hips, knees, and ankles, for which she took Vicodin, as well as numbness and tingling in her hands. (AR 712.) Dr. Hammond noted she appeared depressed, and had moderate spasm and pain in her neck and back muscles. (AR 712.)

By Petitioner's next visit with Dr. Hammond on August 17, 2010, Petitioner had seen a physician at Life Tree. (AR 717, 1187.) Dr. Hammond had recently prescribed Prednisone, and Petitioner reported a dramatic improvement in symptoms. Dr. Hammond noted Petitioner's fibromyalgia symptoms had improved since she began taking Prednisone. (AR 717.) Dr. Lee Smith at Life Tree Pain Clinic reported he agreed with Dr. Hammond's diagnosis of fibromyalgia based upon Petitioner's subjective reports and a lack of other positive objective test results. (AR 719.) At her visit with Dr. Smith, Petitioner complained of pain in her joints, hips, hands, wrists, knees, and ankles, as well as chronic headaches. (AR 723, 725.) While Dr. Smith noted good range of motion, he noted also several tender points over the trapezius, anterior chest, sacrum, and medial knees and lateral hips bilaterally. (AR 725.)

Dr. James Williams, a rheumatologist, examined Petitioner on October 20, 2010, upon a referral by Dr. Smith. (AR 723.) Petitioner reported less joint stiffness and that she felt better while taking prednisone, but that once she was tapered off the prednisone, the fatigue and stiffness returned. She complained of joint pain in her elbows, hips, hands,

**MEMORANDUM DECISION AND ORDER**

wrists, knees and ankles. Petitioner reported also suffering from headaches. (AR 724.)

Upon examination, Dr. Williams noted full range of motion of all joints, but that she had

multiple tender points over the trapezius, anterior chest, sacrum, and medial knees and

lateral hips bilaterally. He agreed with the diagnosis of fibromyalgia. (AR 725.)

When the ALJ does note Petitioner is doing well, the ALJ neglects to mention that

other practitioners are not treating Petitioner's fibromyalgia. For example, the ALJ noted

that, during Petitioner's well-woman check in December of 2008, her examination was

"normal." (AR 19.) Examination notes from December 11, 2008, do reveal that, with

regard to her physical examination (which checked her uterus, vital signs, breasts, and

blood pressure), her exam was normal. (AR 957.) But, there was extensive discussion

between Dr. Johnson and Petitioner regarding the need for the medications Dr. Hammond

had prescribed for her fibromyalgia, and that Dr. Johnson suspected not only fibromyalgia

but chronic fatigue syndrome as the cause of her pain and fatigue. (AR 957.) Similarly,

the ALJ cites to an emergency room treatment note from December of 2009, (AR 473);

although she reported pain of 10/10, emergency room doctors noted Petitioner was in "no

apparent distress and was resting comfortably." (AR 19.) The ALJ left out the fact

Petitioner presented to the emergency room complaining of pain, but upon being given

Zofran, Protonix, Dilaudid, and fluids, she had "excellent resolution of her nausea and

pain" and was "resting comfortably." (AR 473.)

Here, the ALJ relied upon select treatment notes from providers other than Dr.

Hammond, such as Petitioner's internists and emergency room physicians, to reach his

**MEMORANDUM DECISION AND ORDER**

conclusion that Dr. Hammond's opinion was not supported by or consistent with the other medical evidence. Yet, the ALJ disregarded the longitudinal evidence of record from other care providers treating Petitioner's fibromyalgia and headaches, such as Petitioner's physical therapist and her chiropractor, whom she was seeing in addition to Dr. Hammond throughout the relevant time period. To these providers, Petitioner consistently reported widespread diffuse pain. In addition, consultative physicians from Life Tree Pain Clinic corroborated Dr. Hammond's clinic notes, and agreed with Dr. Hammond's diagnosis. Accordingly, the ALJ's conclusory statement that Dr. Hammond's opinion was not supported by the medical evidence of record is in error.

Further, the ALJ did not adequately justify assigning Dr. Hammond's opinions little weight as opposed to the state agency reviewing physicians. The ALJ offered no meaningful explanation for determining Dr. Hammond's opinion was "conclusory." (AR 27.) The ALJ apparently devalued Dr. Hammond's opinion due to its heavy reliance upon Petitioner's subjective complaints. (AR 27.) But, the nature of fibromyalgia, and the lack of objective symptoms, requires such reliance. *See Foley v. Barnhart*, 432 F.Supp.2d 465, 476 (M.D. Pa. 2005). "[I]n a disability determination involving fibromyalgia, it is error to require objective findings when the disease itself eludes such measurement." *Id*. at 480.

When rejecting Dr. Hammond's opinion, the ALJ must present specific contradictory evidence. Dr. Hammond's opinion that Petitioner suffers from severe pain and debilitating conditions that would preclude full-time employment appears to be supported by substantial evidence in the record, specifically Dr. Hammond's medical

**MEMORANDUM DECISION AND ORDER**

records reflecting years of treatment and medication. The ALJ, nonetheless, stated that "there are multiple treatment records where the claimant's subjective statements are not consistent with Dr. Hammond's observations during treatment. Additionally, the clinical findings may supported [sic] reduced functioning in a work setting but they are not consistent with Dr. Hammond's statement that the claimant could not sustain any work activity on a full-time basis." (AR 27.) This is not analysis, but rather a conclusion. The ALJ's conclusion does not refer to any specific records, and provides no opportunity for meaningful judicial review. As such, it cannot be affirmed.

Finally, even if the ALJ correctly refused to give Dr. Hammond's opinion controlling weight, error was committed by the ALJ's failure to apply the necessary factors in deciding how much weight to afford a non-controlling treating physician's opinion. *Gonzalez v. Asture*, 537 F.Supp.2d 644, 661 (D. Del. 2008). Such factors include the treatment relationship, length of relationship, frequency of examination, nature and extent of the treatment relationship, supportability of the opinion afforded by the medical evidence, consistency of the opinion with the record as a whole, and specialization of the treating physician. *See* 20 C.F.R. § 404.1527(d)(2)-(6). The Court cannot discern where the ALJ applied or considered these factors. Here, Dr. Hammond was a specialist in neurology, and treated Petitioner every three to four months over the course of several years.

With regard to Drs. Coolidge and Vestal, the ALJ accorded substantial weight to their opinions, because they were "generally supported by the clinical observations,

**MEMORANDUM DECISION AND ORDER**

diagnostic imaging, and course of treatment." (AR 27.) This is not an adequate explanation. Social security regulations require more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker. *See Gonzalez*, 537 F.Supp.2d at 663; S.S.R. 96–6p. In particular, the opinions themselves must take into account and explain all of the other evidence in the record, including the opinions of treating physicians.

The regulations stress this point with the following:

> [B]ecause nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including the opinions of treating and other examining sources.

20 C.F.R. § 416.927. Drs. Coolidge and Vestal concluded Petitioner's limitations were less severe than opined by her treating neurologist, and that her capabilities were consistent with an ability to do sedentary work. However, the record contains years of medical documentation supplied by Dr. Hammond and others who treated Petitioner's fibromyalgia and recurrent headaches. Yet, the ALJ failed to explain why the non-treating physicians' opinions were "consistent with" the medical record as a whole, whereas Dr. Hammond's opinion was not. Further, the ALJ cited inconsistency with "diagnostic imaging" as a reason to endorse Dr. Coolidge's opinion. Yet, fibromyalgia symptoms are not diagnosed via diagnostic imaging tools. And, the clinical observations (multiple trigger points, continuing complaints of diffuse muscle pain) are consistent with Petitioner's diagnosis of fibromyalgia. Thus, it was error for the AJL to assign substantial

**MEMORANDUM DECISION AND ORDER**

weight to Dr. Coolidge's and Dr. Vestal's opinions.

Respondent makes several arguments for upholding the ALJ's devaluation of Dr. Hammond's opinion. Respondent generally notes that, although Petitioner reported headaches, pain, and other fibromyalgia symptoms to Dr. Hammond, Dr. Hammond's physical examinations consistently showed benign observations, such as normal gait and station, good motor strength, moderate spasms, and normal range of motion. These observations, however, do not account for the multiple tender points, her continued complaints of widespread, diffuse pain, and the presence of other symptoms, such as fatigue and difficulty thinking, that both Dr. Hammond, Dr. Smith, and Dr. Williams confirmed. Orthopedic tests, such as range of motion and normal gait, generally are not relevant for diagnosing fibromyalgia. *See Preston v. Sec'y of Health and Human Services*, 854 F.2d 815, 820 (6th Cir. 1988) ("As noted in the medical journal articles in the record, [fibromyalgia] patients manifest normal muscle strength and neurological reactions and have a full range of motion".). And, the absence of objective findings for a fibromyalgia diagnosis cannot support a conclusion that claimant does not suffer from such a potentially disabling condition.

The ALJ's assignment of little weight to Dr. Hammond's opinion is not supported by substantial evidence in the record.

### 3.    Credibility

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir.

1998). The ALJ's findings must be supported by specific, cogent reasons. *Reddick*, 157 F.3d at 722. If a claimant produces objective medical evidence of an underlying impairment, an ALJ may not reject a claimant's subjective complaints of pain based solely on lack of medical evidence. *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005). *See also Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997) (holding that an ALJ may not discredit a claimant's subjective testimony on the basis that there is no objective medical evidence that supports the testimony).

When assessing the credibility of a claimant's testimony regarding subjective pain or the intensity of symptoms, the ALJ engages in a two-step analysis. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ must determine whether there is "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id*. If the claimant has presented such evidence, and there is no evidence of malingering, the ALJ must give "specific, clear and convincing reasons" to reject the claimant's testimony about the severity of the symptoms. *Id*. At the same time, the ALJ is not "required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

When evaluating the claimant's testimony, the ALJ may use "ordinary techniques of credibility evaluation." *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 n.3 (9th Cir. 2010). For instance, the ALJ may consider inconsistencies either in the claimant's

**MEMORANDUM DECISION AND ORDER**

testimony or between the testimony and the claimant's conduct, *id*.; "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment," *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008); and "whether the claimant engages in daily activities inconsistent with the alleged symptoms," *Lingenfelter v. Astrue*, 504 F.3d 1028, 1040 (9th Cir. 2007). While a claimant need not "vegetate in a dark room" to be eligible for benefits, *Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir. 1987), the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting, *see Morgan v. Comm'r Soc. Sec. Admin*., 169 F.3d 595, 600 (9th Cir. 1999). Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent they contradict claims of a totally debilitating impairment. *See Turner*, 613 F.3d at 1225.

The reasons an ALJ gives for rejecting a claimant's testimony must be supported by substantial evidence in the record. *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1296 (9th Cir. 1999). If there is substantial evidence in the record to support the ALJ's credibility finding, the Court will not engage in second-guessing. *Thomas v. Barnhart*, 278 F.3d 957, 959 (9th Cir. 2002). When the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

The ALJ found Petitioner's impairments could reasonably be expected to cause some of her alleged symptoms, but that her statements about the intensity, persistence,

**MEMORANDUM DECISION AND ORDER**

and limiting effects of the symptoms were not entirely credible. (AR 16.) The ALJ provided two reasons for discrediting Petitioner: (1) lack of support by objective medical evidence; and (2) inconsistency of Petitioner's allegations with her activities of daily living.

The Court already has explained above that fibromyalgia symptoms may not be discredited due to the lack of objective medical evidence, because fibromyalgia, by its nature, is defined by a patient's subjective complaints and the lack of other underlying causes for accurate diagnosis. Petitioner has been diagnosed consistently with fibromyalgia based upon her description of the pain and the presence of tender spots as well as diffuse pain, including diagnosis by a rheumatologist (Dr. Williams), Life Tree Pain Clinic's Dr. Smith, and Dr. Hammond, a neurologist. Accordingly, the ALJ's first proffered reason for his adverse credibility determination does not constitute substantial evidence supporting such determination.

As for Petitioner's activities, the ALJ found that, in 2010, Petitioner was still engaged in her positions at her church despite her symptoms. (AR 24, 26.) The second reason given by the ALJ for discrediting Petitioner's testimony was her ability to care for her two children, as well as her niece. (AR 26.) The ALJ then makes the conclusory statement that Petitioner's ability to care for her school age children and her volunteer work at her church "are generally consistent with the residual functional capacity above." (AR 26.)

With regard to Petitioner's volunteer work, Petitioner reported in a written

statement dated June 21, 2010, that she was considering resigning her position in the Sunday school program and as the treasurer because of mental fog and physical fatigue. (AR 284.) The ALJ failed to account for Petitioner's testimony that her job as church treasurer required only 10 to 15 hours each week, and she could perform some of the work from home. (AR 46.) She resigned because she was making mistakes counting money and could not be relied upon to deposit funds each Monday. (AR 46.) The ALJ failed to articulate how Petitioner's ability to work less than part time, from home, reflects her ability to engage in work outside the home for 8 hours a day, 5 days a week. *See* 20 C.F.R. § 404.1512(a); SSR 96-8p (ALJ must evaluate claimant's ability to engage in work for 8 hours a day and 5 days a week).

Petitioner reported on November 4, 2012, that she babysat for her nieces, ages 2 and 4, "on occasion for 4 or 5 hours max." (AR 301.) As for her own children, they were enrolled full time in school as of November of 2012. (AR 303.) At the time of the hearing in January of 2014, Petitioner's children were 12 and 13 years of age. (AR 44.) The care required of her children was minimal, and consisted of seeing them off to the school bus. (AR 48-49.) While her children were at school and her husband was at work, Petitioner testified she may sometimes go back to bed on a bad day, with heating pads and ice packs applied to reduce her pain. (AR 49.) The ALJ did not account for Petitioner's reduced level of functioning, and the fact that, while her children were at school, she might not leave the house.

Respondent argues numerous medical records contradict Petitioner's testimony,

**MEMORANDUM DECISION AND ORDER**

because her reports to her physicians indicate improvement in her symptoms. (Dkt. 15 at 14.) However, the ALJ cherry-picked portions of the record, as discussed above, and failed to address the types of treatment modalities Petitioner had pursued in an attempt to control her pain from the migraine headaches and fibromyalgia. These treatments included care from a chiropractor and physical therapist, and massages. The record indicates numerous visits to physicians, as well as a visit to a specialist in Salt Lake City, Utah, who confirmed the diagnosis. She testified she takes numerous medications, including narcotics, to control her pain. Petitioner's desire to seek relief from her pain corroborates her complaints. The ALJ did not discuss this evidence with regard to his credibility analysis.

Finally, the ALJ noted Petitioner's testimony at the hearing reflected more limitations than noted in her husband's earlier statement or her prior written reports, suggesting a decrease in her functioning more recently. (AR 25.) Respondent argues this inconsistency constitutes a valid basis to question Petitioner's credibility. The Court is not clear regarding the inconsistency observed by the ALJ.

Upon review of Petitioner's November 2012 function report, she indicated she often does more than she should when she is having a "good day," which then results in successive days experiencing "extreme fatigue and all over pain." (AR 302.) Petitioner described a typical day in 2012 as waking at 5:30 a.m. and sitting with a heat pad on her back for several hours; fixing cereal for her children's breakfast; straightening the house; and resting after fixing a light lunch. (AR 303.) Petitioner described taking

**MEMORANDUM DECISION AND ORDER**

breaks, and that some days she could do a lot, while other days, she could not do anything. (AR 304.) Based upon the Court's review of the testimony at the hearing, Petitioner's function report appears consistent---Petitioner, as well as her husband, testified she had good days and bad days. (AR 50 – 53.) Further, Petitioner's husband testified his wife's condition had become progressively worse since December of 2011. (AR 53-54.) Petitioner's husband indicated the same on the third party function report as well, dated November 4, 2012. (AR 271) (indicating that when his wife is hurting bad, she must lay down, and that "it's getting worse."). Accordingly, the Court views the evidence as consistent with a gradual decrease in functioning.[2]

The Court finds the ALJ erred with regard to his assessment of Petitioner's credibility, based upon the record as a whole.

## 4.      Residual Functional Capacity

Petitioner next argues that the ALJ's RFC finding is not supported by substantial evidence in the record. A claimant's RFC represents a finding of the range of tasks she is capable of performing notwithstanding the impairments at issue. 20 C.F.R. § 404.1545(a). An RFC determination is informed by consideration of a claimant's physical abilities, mental abilities, symptomology, including pain, and other limitations which could

---

[2] Petitioner argues the ALJ erred by finding Petitioner's husband's testimony not entirely credible and assigning it "moderate" weight. The ALJ assigned "moderate" weight to Mr. Leoni's testimony because he was not an "acceptable medical source under the regulations." (AR 28.) That Mr. Leoni, a lay witness, is not an acceptable medical source is a given. The ALJ must give germane reasons for discounting lay witness testimony, such as inconsistent statements, or the failure to provide supporting reasoning. *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012). Numerous regulations command the ALJ to consider, throughout the sequential process, lay testimony as to how a claimant's impairments affect her ability to work. *See, e.g.*, 20 C.F.R. §§ 404.1513(d)(4) & (e), 404.1529(c), 404.1545, 416.913(d)(4) & (e), 416.929(c), 416.945. The fact Mr. Leoni is not an acceptable medical source is not a legitimate or germane reason for assigning his observations as a lay witness less weight.

**MEMORANDUM DECISION AND ORDER**

interfere with work activities on a regular and continuing basis. *Id*. To properly ascertain a claimant's RFC, an ALJ must therefore assess Petitioner's exertional capabilities, addressing his or her ability to sit, stand, walk, lift, carry, push and pull. 20 C.F.R. §§ 404.1545(b), 404.1569a. Nonexertional limitations or impairments, including impairments which result in postural and manipulative limitations, must also be considered. 20 C.F.R. §§ 404.1545(b), 404.1569a; see also 20 C.F.R. Part 404, Subpt. P, App. 2 § 200.00(e). These include mental limitations like the effects of depression, fatigue, pain, tenderness, numbness and muscle spasms.

Because the ALJ did not provide clear and convincing reasons for not including Petitioner's waxing and waning pain symptoms during his assessment of Petitioner's RFC, substantial evidence does not support the ALJ's RFC assessment. Nor does substantial evidence support the ALJ's step-five determination, because it was based on this incomplete RFC assessment. *Ligenfelter v. Astrue*, 504 F.3d 1028, 1041 (9th Cir. 2007) (citing *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984) ("Because ... the ALJ had no clear or convincing reasons for rejecting [claimant's allegations of persistent disabling pain], claimant's pain should have formed a part of the ALJ's question to the expert.").

## CONCLUSION

Petitioner argues the Court should apply the credit as true rule, and decline to remand this matter for further proceedings. An ALJ's failure to provide sufficiently specific reasons for rejecting the testimony of a claimant or other witness does not, without more, require the reviewing court to credit the claimant's testimony as true.

**MEMORANDUM DECISION AND ORDER**

*Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1106 (9th Cir. 2014). In the context of testimony regarding impairments due to excess pain, "[a]n ALJ cannot be required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). "By the same token, a reviewing court is not required to credit claimants' allegations regarding the extent of their impairments as true merely because the ALJ made a legal error in discrediting their testimony." *Treichler*, 775 F.3d at 1106.

Here, the Court finds the ALJ must review the medical reports and resolve the issues with regard to Dr. Hammond's diagnosis, and the medical records as a whole. Further, the ALJ should view the record with an eye toward the elusive quality of fibromyalgia. Accordingly, the Court will remand for further proceedings.

**MEMORANDUM DECISION AND ORDER**

## <u>ORDER</u>

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)     Plaintiff's Petition for Review (Dkt. 1) is **GRANTED**.

2)     This action is **REMANDED** to the Commissioner for further

proceedings consistent with this opinion.

3)     This Remand constitutes a "sentence four remand," consistent with

42 U.S.C. § 405(g) and *Akopyan v. Barnhart*, 296 F.3d 852, 854 (9th Cir.

2002).

DATED: January 24, 2017

Honorable Candy W. Dale
United States Magistrate Judge